# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **CLIFFORD BELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:03-0990** |
| | ) | **JUDGE HAYNES** |
| **METROPOLITAN GOVERNMENT OF** | ) | |
| **NASHVILLE AND DAVIDSON COUNTY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## M E M O R A N D U M

Plaintiff, Clifford Bell, filed this action against the Defendant, the Metropolitan Government of Nashville and Davidson County ("Metro"), asserting claims of race discrimination and retaliatory discharge under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., Plaintiff, a former employee of the Metro Tax Assessor's office, asserts that Metro perpetuated a race-based hostile work environment during Plaintiff's employment, that Metro wrongfully terminated Plaintiff based upon his race, and that Metro discharged Plaintiff in retaliation for his filing a complaint with the Metro Human Resources Office. The gravamen of Plaintiff's complaint is that from the outset of his employment, he was subjected to a hostile work environment based on his race which led to his receiving an unfavorable job performance evaluation on July 16, 2002, and that after he filed a claim of discrimination with the Metro Human Resources Office, Plaintiff faced a continued hostile work environment, and was ultimately terminated on September 3, 2002 based upon his race and in retaliation for filing his claim.

Before the Court is Metro's motion for summary judgment (Docket Entry No. 10), contending, in sum: (1) that Plaintiff cannot establish a prima facie claim of racial discrimination based on "disparate treatment"; (2) that Plaintiff cannot establish a prima facie claim of racial

discrimination based on a "hostile work environment"; (3) that Metro is entitled to an inference that Plaintiff's termination was not discriminatory because Plaintiff was hired and fired by the same person; (4) that Plaintiff cannot establish the elements necessary for a claim of retaliation; and (5) that Metro's decision to terminate Plaintiff's employment was based upon legitimate, non-discriminatory reasons.

In his response (Docket Entry No. 16), Plaintiff contends that he has established a prima facie showing of race discrimination and retaliation under Title VII.

For the reasons set forth below, the Court concludes that Plaintiff has failed to demonstrate that he was subject to a racially hostile work environment. The Court also concludes that Plaintiff has failed to state a prima facie claim of wrongful termination based on race or disparate treatment based on race because Plaintiff has failed to demonstrate that he was replaced by an employee who does not belong to a class of persons protected by Title VII, nor has Plaintiff demonstrated that he suffered disparate treatment from similarly situated non-protected employees. Yet, the Court concludes that Plaintiff has presented sufficient proof on his claim of retaliation. In addition, because Plaintiff has sued a government defendant, Plaintiff may not recover punitive damages.

Accordingly, the Court concludes that Metro's motion for summary judgment should be granted in part, to dismiss Plaintiff's claims of a racially hostile work environment, wrongful termination based on race and disparate treatment based on race, as well as Plaintiff's punitive damages claim. However, Metro's motion for summary judgment should be denied as to Plaintiff's retaliation claim.

2

## A. REVIEW OF THE RECORD[1]

Plaintiff, an African-American male, was hired by the Metro Tax Assessor's Office on January 2, 2002, to be its training coordinator. (Docket Entry No. 17, Plaintiff's Response to Metro's Statement of Undisputed Facts at ¶ 1). The training coordinator position was newly created by the Tax Assessor's Office, and its primary responsibility was to develop a comprehensive training program for the staff. (Docket Entry No. 18, Plaintiff's Appendix, Exhibit 15 attached thereto, George Rooker Deposition at 30, 35). Plaintiff came to this position with fifteen years' experience as a training coordinator with the State of Tennessee. (Docket Entry No. 1, Verified Complaint at ¶ 7).

Prior to being hired, Plaintiff was interviewed on two occasions in Fall 2001 by Assessor of Property JoAnn North and Chief Deputy Assessor George Rooker. (Docket Entry No. 17 at ¶¶ 3-4). During this interview process, North and Rooker advised Plaintiff that their goal was "to put together a training plan and program for the staff, so that we could be a more professional and efficient office." Id. at ¶ 6. Moreover, Plaintiff listed in several places on his employment application that he had used the Microsoft Windows, Word, and Excel programs in connection with developing training materials for his previous employers. Id. at ¶ 5. North was excited about hiring Plaintiff because of his apparent experience and qualifications, and hired Plaintiff as a professional-

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986), app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52, (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Because there are no material factual disputes, this section constitute findings of fact under Fed. R. Civ. P. 56(d), except for Plaintiff's retaliation claim.

3

level, salaried employee. (Docket Entry No. 18, Exhibit 27 attached thereto, JoAnn North Deposition at 18; Docket Entry No. 17 at ¶¶ 2, 7).

As with all newly hired employees, Plaintiff was placed on a six-month probationary period when he began his employment as the training coordinator for the Tax Assessor's Office. (Docket Entry No. 17 at ¶ 8). After a successful completion of this probationary period, Plaintiff would have become a sworn Deputy Assessor. Id. at ¶ 9. Despite his probationary status, Plaintiff worked in a management-level or "team leader" position, and at the time he was hired, he was the only African American of the nine management-level employees. (Docket Entry No. 18, Plaintiff's Appendix, Exhibit 15 attached thereto, George Rooker Deposition at 21).

Some time after he began his employment, Plaintiff would have meetings with managers and/or team leaders. (Docket Entry No. 17 at ¶ 14) For instance, on April 1, 2002, Plaintiff met with one of the managers of technical services and two team leaders regarding the development of a plan to provide training in AssessPro, the office appraisal system. Id. Plaintiff complained that on two occasions, he was not apprised of two management meetings. (Docket Entry No. 17 at ¶ 10). For one of these meetings, however, Plaintiff admits that he received an email announcing the meeting, but did not check his email in time. Id. Nevertheless, Plaintiff contends that his office was directly adjacent to the conference room, and should have been summoned personally to the meetings once his absence was noted. Id.

In addition, Plaintiff complained that his doorplate was removed. Id. at ¶ 12. Plaintiff's doorplate listed only his position as "Training Director," whereas all other management-level employees' doorplates display the given employee's name and not the title. Id. David Diaz-Barriga, Plaintiff's immediate supervisor, took Plaintiff out to lunch and explained that the doorplate was removed because he thought that Plaintiff's unique doorplate was the object of a "good-natured

4

joke" directed toward Plaintiff, a new employee. Id. at ¶ 12; Docket Entry No. 1, Verified Complaint, Exhibit F attached thereto, J. North Letter Aug. 22, 2002. According to North, however, Plaintiff "insisted that his title rather than his name be on his door and [she] accommodated that request even though everyone else simply has their name at their door." (Docket Entry No. 1, Verified Complaint, Exhibit F attached thereto, J. North Letter Aug. 22, 2002). Plaintiff's "Training Director" doorplate was replaced the next business day following its removal. (Docket Entry No. 17 at ¶ 12).

Somewhere between April and May 2002, Rooker explained to Plaintiff that he needed to "get[] the ball rolling" regarding the development of a training program. Id. at ¶ 15. According to Rooker: "We were trying to get a plan produced, and there were some occasions when information was to be presented, and it was not ready or available for presentation." (Docket Entry No. 10, Metro's Motion for Summary Judgment, attachment thereto, Rooker Deposition at 41). Rooker met with Plaintiff many times before June regarding the development of such a plan. (Docket Entry No. 17 at ¶ 16).

On June 6, 2002, Plaintiff delivered a PowerPoint presentation to North and Rooker of his developed training program. Id. at ¶ 18. Upon conclusion of this presentation, North told Plaintiff that the presentation was "unacceptable", and Rooker was similarly not pleased with the presentation. Id. at ¶¶ 19-20. In particular, North and Rooker explained to Plaintiff that the presentation did not set a time-frame necessary for training, failed to identify resources to be utilized for developing a program, and lacked any recommendations for a curriculum. Id. at ¶ 19; see also Docket Entry No. 10, attachment thereto, Rooker Deposition at 61. North also told Plaintiff: "You've wasted my time. We've wasted six months of salary, and we still don't have a training plan." (Docket Entry No. 10, attachment thereto, North Deposition at 50). In all, North and Rooker

5

spent twenty to thirty minutes communicating their disappointment with Plaintiff. (Docket Entry No. 17 at ¶ 21).

Notwithstanding the events of the June 6 meeting, the June 2002 North News, the newsletter of the Metro Tax Assessor's Office, featured the following entry concerning Plaintiff:

> Cliff Bell comes to us from the State Department of Safety with 19 years of training experience. He will head up our training department. Already sixteen employees have successfully completed IAAO training emphasizing the importance placed by our administration on maintaining our professional growth.
>
> &ast; &ast; &ast;
>
> Cliff Bell also joined our office in January, and . . . has made a real contribution.

(Docket Entry No. 1 at ¶ 14 (quoting North News June 2002 at 1-2)). In her deposition, North contends that she did not believe this assessment of Plaintiff, but "thought it would give him some incentive and pump him up, and maybe he could produce or would produce." (Docket Entry No. 10, attachment thereto, North Deposition at 50).

On July 16, 2002, Plaintiff received his six-month evaluation, which was unfavorable. (Docket Entry No. 17 at ¶ 22). In an addendum to his evaluation, Rooker wrote the following:

> During your first six months of employment with the Assessor's Office your primary responsibility has been to produce a comprehensive training plan for the Office.
>
> As we have discussed on several occasions when progress meetings were held, your work product has not been acceptable, and the plan you recently presented did not represent a comprehensive plan from which training could be launched.
>
> I regret that at this point, you have failed your probationary period.

(Docket Entry No. 10, attachment thereto, Plaintiff Deposition, late-filed Exhibit 2 attached thereto, EEOC Complaint, attachment thereto, Plaintiff's performance review).

The addendum explained further that, "[u]nder normal circumstances, your employment with this office would be terminated. However, your probationary period will be extended for forty-five

6

(45) days, during which time you will be given an opportunity to produce a comprehensive plan meeting the requirements of this office." Id. In addition, Rooker advised Plaintiff that Diaz-Barriga was assigned to supervise Plaintiff, and that "to avoid miscommunication, I will reduce the training program requirements we have previously discussed to writing." Id.

For his part, Plaintiff disagrees with his evaluation and felt it was unfair. (Docket Entry No. 17 at ¶ 22). Plaintiff also listed fifteen "completed tasks" as his own addendum to his evaluation. (Docket Entry No. 10, attachment thereto, Plaintiff Deposition, Late-filed Exhibit 2, attached thereto, EEOC Complaint, attachment thereto, Plaintiff's performance review). Plaintiff also asserts that he never received from Rooker a written description of the desired training program requirements. (Docket Entry No. 17 at ¶ 27). However, Rooker responds that he gave Plaintiff a copy of a document prepared by Rooker in 2001 as a model for what he and North were looking for from Plaintiff. (Docket Entry No. 10, attachment thereto, Rooker Deposition at 56, 131 and Exhibit 10).

Moreover, Plaintiff listed as an "expectation[] to complete" the task of "get[ting] out in the field . . . to learn all the aspects of the assessment industry." (Docket Entry No. 17 at ¶ 27). Other managers go into the field on occasion depending on the circumstances and the need for it. Id. at ¶ 30. Plaintiff himself had been out in the field on previous occasions, but once he cited a medical condition (asthma), Plaintiff received no more assignments. Id. at ¶¶ 29, 31. Plaintiff asserts in this action that his field work consisted of "non-professional, manual labor" not suited for his position. Id. at Response to ¶ 28.

Almost immediately after Plaintiff received the unfavorable performance evaluation, Plaintiff made an oral complaint to Veronica Frazier of the Metro Human Resources Department alleging

7

racial discrimination.[2] (Docket Entry No. 1 at ¶ 16). He followed that oral complaint with a letter to North dated July 30, 2002, in which he stated, in part:

> Th[e six-month performance] evaluation, I feel, is not a fair assessment of my abilities to perform my job. I have not been empowered to give input or make decisions pertaining to training. I feel a lack of confidence, support, and motivation from my superiors. <u>As a minority, I feel I may not be receiving fair and equal treatment in the workplace.</u>
> The poor rating that I received on my evaluation has adversely affected me financially since I will not be receiving the bonus associated with an adequate performance rating. It will also have an adverse affect on the future advancement of my career.

(Docket Entry No. 1, Exhibit A attached thereto, Plaintiff Letter July 30, 2002 at 1-2) (emphasis added).

North responded to Plaintiff's letter in an August 2, 2002 letter. <u>Id.</u>, Exhibit B attached thereto, North Letter Aug. 2, 2002. North closed her letter by stating: "There is no place for race, gender or bias of any kind in this office and job classifications or promotions are not affected by such bias. Experience and ability to produce drive this office." <u>Id.</u> Further, in a memorandum to Plaintiff dated August 6, 2002, North advised Plaintiff that "[a]ll questions regarding your grievance should be directed to Veronica Frazier." <u>Id.</u>, Exhibit C attached thereto, North Memorandum Aug. 6, 2002.

In a hand-delivered letter dated August 19, 2002, North requested from Plaintiff a written

---

[2] According to Frazier, the Metro Human Resources Department conducts investigations of claims of workplace discrimination by Metro employees. (Docket Entry No. 18, Plaintiff's Appendix, Exhibit 38 attached thereto, Veronica Frazier Deposition at 21). The investigation process is different for civil service employees and non-civil service employees. <u>Id.</u> at 27-28. For a non-civil service employee, the employee is entitled to an investigation with corresponding findings only if such an investigation is approved by the head of the department for which the complaining party works. <u>Id.</u> It is undisputed that Plaintiff is a non-civil service employee. <u>See</u> Docket Entry No. 16, Plaintiff's Response to Summary Judgment at 6.

statement from Plaintiff detailing his alleged instances of racial discrimination against him.  Id.,

Exhibit D attached thereto, North Letter Aug. 19, 2002.  In this letter, North assured Plaintiff that

"I take such accusations very seriously and intend to conduct a thorough investigation."  Id.  In her

deposition, North explained that decided to undertake her own investigation because she "never got

anything from Veronica Frazier."  (Docket Entry No. 18, Exhibit 27 attached thereto, North

Deposition at 57-58).

The next day, August 20, 2002, Plaintiff's retained counsel submitted to North a letter

outlining how "Mr. Bell has been systematically marginalized in [his] position and subjected to

disparate treatment."  (Docket Entry No. 1, Exhibit E attached thereto, Danner Letter Aug. 20,

2002).  Plaintiff's counsel's letter provides the following specific alleged examples of

discrimination:

- Mr. Bell was the only one of your nine managers, all of whom are white, that has been excluded from a manage[ment]-level meeting, because he was not informed of the meeting.

- Mr. Bell's door plate stating his title as training director was removed from his door for a few days.

- Mr. Bell's management position was effectively made into a data entry position based on being directed to enter data into spreadsheets, instead of the genuine duties of the position of training personnel and developing a training facility.

- Mr. Bell is consistently asked to justify his position in writing and with short notice.

- Your office permitted George Thomas, Jr. to usurp Mr. Bell's duty of developing a training center wherein Mr. Thomas communicated directly with Metro Facilities Planning to the exclusion of Mr. Bell.

- You personally do not greet or speak to Mr. Bell as you do your other employees even though you must pass his office to get to yours.

9

- Mr. Rooker spends less management time with Mr. Bell than other employees.

- Mr. Bell is penalized for minor minutes of lost time whereas some of your other employees spend excessive time away from the office even for personal, non-Metro business on the city's time.

- Mr. Bell has been effectively demoted from training director to performing manual labor away from the office with a non-management employee, before he submitted a doctor's statement that such assignment was contrary to his health.

Id.

Plaintiff's counsel's letter also alleges that "Mr. Bell has been set[]up to fail by your office because he was not supplied with clear guidelines on your expectations of him upon starting employment." Id. Additionally, Plaintiff's counsel admonished North "to ensure that [Plaintiff] is not manipulated as a racial token nor marginalized into submission and humiliation by your office." Id.[3]

North responded in an August 22, 2002 letter, in which she denied and/or explained the context of Plaintiff's allegations. (Docket Entry No. 1, Exhibit F attached thereto, North Letter Aug. 22, 2002). In sum, North claimed, in response to Plaintiff's allegations: (1) that Plaintiff missed a management meeting because he did not check his email alerting him of the meeting; (2) that Diaz-Barriga had Plaintiff's doorplate removed because it displayed Plaintiff's title and not his name, and Diaz-Barriga assumed such an anomaly was a "good-natured joke" perpetrated against Plaintiff, and that once North explained to Diaz-Barriga that Plaintiff requested such a doorplate, it was promptly placed back on Plaintiff's door; (3) that Plaintiff was asked to prepare a spreadsheet commensurate

_____

[3] Each of Plaintiff's counsel letters were sent to Frazier, Ivanetta Davis of the Metropolitan Legal Department, and Nashville Mayor Bill Purcell. See, e.g., Docket Entry No. 1, Exhibit E attached thereto, Danner Letter Aug. 20, 2002 at 3.

10

with his duties, as have all other managers at one time or another, and nevertheless Plaintiff indicated on his resume that he was fluent in spreadsheet software; (4) that North asked Plaintiff to list his accomplishments and goals, and that it is customary to ask probationary employees to demonstrate that "the position justifies the spending of taxpayers['] resources on such a position"; (5) that George Thomas was assigned to refurbish the Customer Service Department, and that the training center would be considered once Thomas's assignment was completed; (6) that North does not believe that she ignores Plaintiff; (7) that the time Rooker spends with Plaintiff does not amount to racial discrimination; (8) that Plaintiff's allegations regarding penalties is false, and any information regarding disciplinary matters are in employees' confidential files; and (9) that Plaintiff was assigned to field work at his request, and that he complained only after he was assigned to go to the field with a Caucasian appraiser and after he received his unfavorable evaluation. Id.

North concluded that "all of Mr. Bell's claims and complaints that are specific enough to be susceptible of investigation have been fully investigated and determined to be wholly and objectively demonstrated to be without merit. So far as this office is concerned, the investigation is closed. Entirely too much time and productivity has been expended on this matter." Id.

On August 23, 2002, North wrote Plaintiff that she had received word from Frazier that Plaintiff has been retaliated against by Diaz-Barriga since the filing of his discriminated complaint. Id., Exhibit G attached thereto, North Letter Aug. 23, 2002. North requested that Plaintiff submit by lunchtime that day to deliver to North a letter detailing the substance of Plaintiff's allegations, and "assure[d Plaintiff] of a speedy, fair, and full investigation." Id.

On August 30, 2002, a hand-delivered letter by Plaintiff's counsel purportedly responded to North's August 23 letter. Id., Exhibit H attached thereto, Danner Letter Aug. 30, 2002. However,

rather than specify Plaintiff's retaliation allegations, Plaintiff's counsel admonished North for failing to produce a job description for Plaintiff and giving him a poor performance evaluation, and demanded North take certain actions, such as undergo diversity and sensitivity training (with Plaintiff as director), rescind Plaintiff's poor evaluation, and refund Plaintiff's attorneys' fees. Id. Additionally, Plaintiff's counsel advised North that "[i]f our offices cannot resolve this racial conflict on or before the date of Mr. Bell's next evaluation date of on or about September 4, then a charge of discrimination will be filed with the EEOC." Id. Plaintiff's counsel also demanded Plaintiff "be treated like a human being extending even to the most subtle of interactions instead of continuing to be treated like Ralph Ellison's Invisible Man." Id.

On September 3, North, through her own retained counsel, sent a letter to Plaintiff's counsel in response to Plaintiff's counsel's August 30 letter. (Docket Entry No. 1, Exhibit I attached thereto, S. North Letter Sept. 3, 2002). This letter reflected that North "thought it advisable to communicate through a lawyer" given Plaintiff's counsel's threat of a lawsuit. Id. The letter provided Plaintiff's counsel with North's version of the series of events pertinent to Plaintiff's complaint, contending that North conducted her own investigation because she "received no response [from Frazier] to her request [to provide North with details of Plaintiff's complaints] after over [two] weeks . . . ." Id. North's counsel explained that North promised "confidentiality and . . . a full and fair investigation[,]" but ultimately, North concluded that Plaintiff's allegations "were shown to be demonstrably and categorically false . . . [and] so far from the truth as to raise substantial doubts about Mr. Bell's credibility." Id. The letter explained further that:

> [Plaintiff] made no allegations of racial bias until immediately after an unfavorable evaluation. When he finally was forced to put his allegations in writing with the help of his lawyer, they were refuted and many were shown to be outright misrepresentations. One day later he makes vague retaliation claims but refuses to

12

put them in writing or be specific. When required by his employer to state specifically and in writing his complaints as to retaliation he refuses to do so but instead his lawyer sends a letter trying to intimidate the employer with the threat of a lawsuit.

Id. at 3. Accordingly, North's counsel concluded that "[s]ince Mrs. North has not been presented with any factual allegations of discrimination, I see no valid racial conflict to be resolved." Id.

Also on September 3, Plaintiff received a letter of termination. (Docket Entry No. 18, Exhibit 15 attached thereto, Rooker Deposition, Exhibit 19 attached thereto, Termination Letter). August 30, 2002, the date of Plaintiff's counsel's latest letter, also represented the expiration of his additional forty-five day probationary period. Id. During his additional forty-five day period, Plaintiff submitted revised drafts of his training plan, but North and Rooker deemed them unsatisfactory as the drafts "did not constitute a complete and finished plan, without errors." (Docket Entry No. 17 at ¶ 33). As a consequence, on September 3, North sent Plaintiff a termination letter with the following explanation: "Your forty-five day extended probation ended Friday, August 30, 2002. You have not met the deadlines and assignments outlined in your six-month review. You are therefore terminated effective immediately." (Docket Entry No. 18, Exhibit 15 attached thereto, Rooker Deposition, Exhibit 19 attached thereto, Termination Letter).

North received a letter from Frazier on September 10, 2002 outlining Plaintiff's allegations. (Docket Entry No. 1, Exhibit J attached thereto, Frazier Letter Sept. 10, 2002). Frazier's summary lists among Plaintiff's allegations his absence from a management meeting, his poor evaluation notwithstanding his commendation in the office newsletter, and a lack of direction and instruction. Id. at 1-2. Frazier additionally mentions that Plaintiff contends that "there are no African-American employees in supervisory or management positions within the Tax Assessor's office" and that "[f]ellow African-American employees in the Tax Assessor's office substantiated Mr. Bell's concern

13

of racial bias." Id.

On September 19, 2002, North's counsel sent a letter to Frazier denying each of Plaintiff's claims. Id., Exhibit K attached thereto, S. North Letter Sept. 19, 2002. In denying Plaintiff's charge that he was terminated in retaliation for making his complaint to Frazier, North's counsel explains:

> Mr. Bell's primary assignment was to produce and present a comprehensive training plan for the Assessor's Office. When he failed to do so during his initial six months probationary period, he was given an additional 45 days and virtually daily help to try to help him produce his assignment. He either could not or would not accomplish this task. In addition, during his probationary period, Mrs. North learned that he had been blatantly untruthful on his application for employment. He relied "no" to question number 5 "Have you ever been discharged or forced to resign from employment?" In fact, he was terminated by the Montgomery County Schools for providing alcoholic beverages to 9th grade boys . . . and from Mrs. Winners for dishonesty. . . . To my knowledge that indictment is still pending.

Id. at 4.

This letter also claims that Plaintiff's allegations demonstrate a "paucity of facts", and informs Frazier that:

> The work of the Assessor's Office has been disrupted and production hurt by this matter. Any complaint of discrimination is taken seriously, but this complaint is so frivolous and baseless that further investigation appears to me to be unnecessary. However, if you [determine] there is some factual issue that is relevant to Mr. Bell's specific complaints and there is some witness that you have some reason to think can substantiate such claim[s], please let Mrs. North know the name of the person and she will arrange for you to have an interview. . . . This is a busy and stressful time for the Assessor's Office and this matter should be concluded as soon as possible.

Id.

Frazier replied to North's counsel's letter with her own letter dated October 11, 2002. Id., Exhibit L attached thereto, Frazier Letter Oct. 11, 2002. Frazier indicated to North's counsel that "[w]hile our department only interviewed a few employees initially, statements were made that we believe require further inquiry[,]" and recommended that North "continue the investigative process that resulted from the allegations made by Clifford Bell." Id. In a response dated October 22, 2002,

14

North's counsel advised Frazier that "[a]ll of Clifford Bell's allegations have been thoroughly and exhaustively investigated and found to be wholly without merit." Id., Exhibit M attached thereto, S. North Letter Oct. 22, 2002. As such, North's counsel requested that Frazier "close that investigation with a finding of fact that [Plaintiff's] allegations have no merit." Id. North's counsel further informed Frazier that if a new complaint is made, the Tax Assessor's Office will itself determine whether further investigation is necessary, and will conduct that investigation, if any. Id. North's counsel also requested Frazier forward to North information regarding the statements of other employees suggesting a racially tense work environment.

Finally, on December 5, 2002, Frazier submitted a letter to North's counsel indicating that during her investigation, her staff interviewed six employees in the Assessor's office that "stated their concerns regarding African-Americans in any supervisory or management positions within Ms. North's office." Id., Exhibit N attached thereto, Frazier Letter Dec. 5, 2002. Additionally, Frazier advised North's counsel that "[i]n relation to Mr. Bell's allegations, we did consider that the Assessor's department is comparatively small and few supervisory and management positions exist." Id. Finally, Frazier expressed her concern that her office had questions regarding an apparent discrepancy between North's description of Plaintiff's work product and his commendation in the office newsletter. Id.

One of the employees interviewed by Frazier was Bertha Harris, a thirty-year employee of the Tax Assessor's Office. (Docket Entry No. 18, Exhibit 38 attached thereto, Veronica Frazier Deposition, Exhibit 6 attached thereto, notes of Bertha Harris interview). Harris told Frazier that "I feel the hates between blacks and whites," and that there were no African-American supervisors or team leaders in the Tax Assessor's Office. Id. at 2. She also told Frazier that Plaintiff "helped

15

better the place." Id. at 3. For her part, Harris indicated to Frazier that North offered Harris a promotion within the Mapping Department, and that North took "bad apples" out of leadership roles. Id.

Another employee, Judy Cooper, told Frazier that North "doesn't think blacks are competent [and] took all blacks out of leadership" positions. Id., Exhibit 7 attached thereto, notes of Judy Cooper interview. Cooper also told Frazier that she believed that North treated black employees differently from white employees, citing various instances from North demoting African-American supervisors to not treating African-American employees differently with regard to civil service status, smoking rights, and even throwing a wedding shower. Id., Exhibit 38 attached thereto, Frazier Deposition at 190 and Exhibit 7 attached thereto. Cooper believed that North "carrie[d] a grudge" and tried to "take black women out of leadership." Id., Exhibit 7 attached thereto. In her own deposition in this action, Cooper testified that she was demoted from her supervisor position by North upon North's ascension to Tax Assessor, and that two other African-American supervisors – Bertha Harris and Michael Matlock – were also demoted. Id., Exhibit 25 attached thereto, Judy Cooper Deposition at 12-13. Cooper also testified that she was not treated as a team leader until after Frazier's deposition in this action, which was attended by North. (Docket Entry No. 16, Plaintiff's Response to Summary Judgment at 9).

A third employee, Theodore Harris, was interviewed during Frazier's investigation. (Docket Entry No. 18, Exhibit 38 attached thereto, Frazier Deposition at 191-94). Harris complained to Frazier that there was "tension in [the] office between blacks and whites and the administration." Id. at 192. Harris also voiced his concern that there were no African-American managers at the Tax Assessor's office. Id.

16

None of these employees discussed the specifics of Plaintiff's allegations, except that Cooper observed that North and Rooker were cold to Plaintiff, and Theodore Harris told Frazier that Plaintiff complained to him about the missed managerial meeting. Id., Exhibit 38 attached thereto at 192-93 and Exhibit 7 attached thereto, notes of Judy Cooper interview. Moreover, the majority of their testimony relates to their experiences and impressions within the Tax Assessors Office during the mid-1990s. Id., Exhibits 25, 26, and 34 attached thereto, excerpts of Bertha Harris, Judy Cooper and Theodore Harris depositions. For their part, however, Bertha Harris, Cooper and Theodore Harris corroborated the content of their interview during their depositions in this action. See id.

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on December 19, 2002. (Docket Entry No. 17 at ¶ 36). On May 14, 2003, the EEOC issued its findings:

> The evidence of record supports the allegations of a Title VII violation. [Plaintiff] was subjected to different terms and conditions of employment, harassed, intimidated, and eventually had his employment terminated, all in retaliation of his complaining of racial discrimination. Upon [Plaintiff's] filing of a written complaint to the County Assessor of racial discrimination, the Assessor outwardly changed her method of interacting and communicating with [Plaintiff]. The [Plaintiff] was harassed by [North] through her unilaterally changing the terms and conditions of his employment. Further, [North] directed members of her staff to conduct a detailed background investigation of [Plaintiff] after his allegation of discrimination. This type of detailed investigation had not been conducted on other employees, and was a retaliatory act.

(Docket Entry No. 1, Exhibit O attached thereto, EEOC findings at 2).[4]

---

[4] Plaintiff has not presented to this Court any evidence, nor any allegation, that North "outwardly changed her method of interacting and communicating" with Plaintiff following his complaint to Frazier or that North "directed members of her staff to conduct a detailed background investigation." Accordingly, these findings are not relevant to this action and the Court will not consider them in evaluating Metro's motion for summary judgment.

Case 3:03-cv-00990   Document 25   Filed 07/12/05   Page 17 of 40 PageID #: 57

In its findings, the EEOC encouraged Plaintiff and Metro to "reach[] a just resolution of this matter" through conciliation  Id.  Upon the failure of such conciliation satisfactory to the parties, Plaintiff received a right to sue notice on September 16, 2003, and Plaintiff filed this action on October 23, 2003.  (Docket Entry No.1 & Exhibit P attached thereto, Right to Sue Notice).

## B. CONCLUSIONS OF LAW

### 1. Standard of Review

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986).   Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56© of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'  By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.

18

477 U.S. at 247-48 (emphasis added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. <u>Celotex Corp. v. Catrett</u>, 477 U.S. at 326. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. <u>Emmons v. McLaughlin</u>, 874 F.2d 351, 355-57 (6th Cir. 1989). <u>But see Routman v. Automatic Data Processing, Inc.</u>, 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in <u>Celotex</u>:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

<u>Celotex</u>, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56© standards." <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. <u>Sims v. Memphis Processors, Inc.</u>, 926 F.2d 524, 526 (6th Cir. 1991) (quoting <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its

19

initial burden of 'demonstrating the absence of a genuine issue of material fact,' the nonmoving

party then 'must set forth specific facts showing that there is a genuine issue for trial.' " Emmons

v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he

respondent must adduce more than a scintilla of evidence to overcome the motion [and] . . . must

'present affirmative evidence in order to defeat a properly supported motion for summary

judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Liberty

Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical
> doubt as to the material facts." Further, "[w]here the record taken as a whole could
> not lead a rational trier of fact to find" for the respondent, the motion should be
> granted. The trial court has at least some discretion to determine whether the
> respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted); see also Hutt v. Gibson Fiber Glass Prods., 914 F.2d

790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine

'whether the evidence presents a sufficient disagreement to require a submission to the jury or

whether it is so one-sided that one party must prevail as a matter of law.' " (quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material

factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the
> dispute about a material fact is 'genuine' that is, if the evidence is such that a
> reasonable jury could return a verdict for the nonmoving party.
>
>        *   *   *
>
> Progressing to the specific issue in this case, we are convinced that      the
> inquiry involved in a ruling on a motion for summary judgment or for a directed
> verdict necessarily implicates the substantive evidentiary standard of proof that
> would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case
> moves for summary judgment or for a directed verdict based on the lack of proof of

a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248 (citation omitted and emphasis added).

It is likewise true that:

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . ."

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation

omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be

read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d

43, 46 (6th Cir. 1986) app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

The Court of Appeals further explained the District Court's role in evaluating the proof on

a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New International Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the

21

nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989) . Here, the parties have given some references to the proof upon which they rely. Local Rule 8(b)(7)(A) and © require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1.    Complex cases are not necessarily inappropriate for summary judgment.

2.    Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.    The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.    This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.    A court should apply a federal directed verdict standard in ruling on a motion for summary judgment.  The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.    As on federal directed verdict motions, the 'scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.    The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.    The respondent cannot rely on the hope that the trier of fact will disbelieve

22

the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.    The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.    The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence.  The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.'  Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment:  (1) has the moving party "clearly and convincingly" established the absence of material facts?;  (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Particularly close scrutiny is required to be given to motions for summary judgment in civil rights cases.  Azar v. Conley, 456 F.2d 1382, 1384 n.1 (6th Cir. 1972); see also Tarlton v. Meharry Med. Coll., 717 F.2d 1523, 1535 (6th Cir. 1984).  This principle, however, does not preclude an award of summary judgment as the Sixth Circuit has held that summary judgment can be awarded in an appropriate Title VII case.  Shah v. Gen. Elec. Co., 816 F.2d 264, 271 (6th Cir. 1987).

### 2.  Title VII Claims

Title VII prohibits discrimination in employment on the basis of race.   See 42 U.S.C. § 2000e-2(a)(1).  Plaintiff characterizes his claims against Metro as "[e]ssentially . . . the following:"

23

(1) "that after he was employed at the Tax Assessor's Office, he was increasingly exposed to a hostile work environment based on his race which led to his receiving an unfavorable job performance evaluation on July 16, 2002;" and (2) "that after he filed a claim of discrimination with the Metro Human Resources Office, he faced continued racial discrimination which increased the hostile work environment and let to his termination on September 3, 2002." (Docket Entry No. 16, Plaintiff's Response to Metro's Motion for Summary Judgment at 19). The Court considers each in turn.

### a. Hostile Work Environment

Under Title VII, a "workplace [which] is permeated with 'discriminatory intimidation, ridicule, and insult,' and that is 'sufficiently severe or pervasive to alter the conditions of the victims employment and create an abusive working environment'" violates the Act. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). In Newman v. Fed. Express Corp., 266 F.3d 401 (6th Cir. 2001), the Sixth Circuit stated that in order for a Plaintiff to establish the existence of a racially hostile work environment claim under Title VII, he must prove the following elements: "(1) that he is a member of a protected class; (2) that he was subjected to unwelcome racial harassment; (3) that the harassment was based on race; (4) that the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the existence of employer liability." 266 F.3d at 405.

The Sixth Circuit requires the district court to examine the totality of the circumstances surrounding the racially offense conduct to determine if the offensive conduct is objectively and subjectively offensive. Id. (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998);

24

Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). In particular, a court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. However, "[t]he Supreme Court has consistently held that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.' " Newman, 266 F.3d at 405 (quoting Faragher, 524 U.S. at 788).

Here, it is undisputed that Plaintiff is an African-American former employee of Metro's Tax Assessor's Office. See, e.g., Docket Entry No. 1, Verified Complaint at ¶ 7. Plaintiff offers as evidence of the existence of a hostile work environment during his employment the following:

- [Plaintiff] was the only one of nine managers, all of whom are white, that had been excluded from a management-level meetings in the Tax Assessor's Office, because he was not informed of the meetings;

- [Plaintiff's] door plate stating his title as training director was removed from his door;

- [Plaintiff's] management position was effectively made into a data entry position based on being directed to enter data into spreadsheets, instead of the genuine duties of the position of training personnel and developing a training facility;

- [Plaintiff] was consistently required to justify his position in writing and with short notice;

- North instructed George Thomas, a white male to [Plaintiff's] duty of developing a training center by Thomas rather than Bell to communicate directly with the Metro Facilities Planning Board;

- North personally do not greet or speak to [Plaintiff] as she did other employees even though she daily passed his office;

- Rooker, North's deputy, spent less management time with [Plaintiff] than other white employees.

25

- [Plaintiff] was penalized for minor minutes of lost time whereas other white employees spend excessive time away from the office even for personal, non-Metro business on the city's time but yet were not penalized; and

- [Plaintiff] has been effectively demoted from training director to performing manual labor away from the office with a non-management employee, before he submitted a doctor's statement that such assignment was contrary to his health.

(Docket Entry No. 16 at 22-23). Plaintiff also cites as evidence of a hostile work environment North's "ridicule[] and belittl[ing]" of Plaintiff during his June 6, 2002 presentation of his training plan proposal, her unfavorable performance evaluation of Plaintiff and placement on an additional forty-five day probationary period, and her demands of Plaintiff to provide written statements of alleged discrimination. Id. at 23-23. Plaintiff cites further North's termination of the investigation of Plaintiff's race discrimination allegations and her background investigation of Plaintiff "without any notice" to him. Id. at 24.

The record presented in this case demonstrates that Plaintiff missed two meetings. (Docket Entry No. 17, Plaintiff's Response to Metro's Statement of Undisputed Facts at ¶ 10). For one of these meetings, Plaintiff concedes that he was not "excluded from management meetings", but rather failed to attend a meeting about which he was notified about by an email announcement because he neglected to check his email. Id. Thus, Plaintiff was not apprised of one management meeting at the most.

The record also demonstrates that Plaintiff was notified that his doorplate, which listed only his title, was removed because it was different from other employees' doorplates, which displayed only the employees' names, and Plaintiff's supervisor, David Diaz-Barriga, believed it was different because an employee was playing a "good-natured" joke on the newly-hired Plaintiff. Id. at ¶¶ 11,

26

13. It is further undisputed that Plaintiff's doorplate was reaffixed to his office door the day following his complaint. Id. at ¶ 12.

Plaintiff fails to present evidence beyond his mere allegations several of his other contentions. Specifically, the Court finds no evidence on the record that Plaintiff was penalized for lost time whereas other employees faced no similar discipline, that George Thomas "usurped" Plaintiff's responsibilities, that Rooker spent less time with Plaintiff than other employees, or that Plaintiff had been "effectively demoted" in having to prepare spreadsheets and work in the field. Moreover, the evidence reflects that Plaintiff listed in his job description his proficiency in Microsoft Excel software, that Plaintiff requested field work, and that Plaintiff's presentation, in which he was purportedly "ridiculed and belittled", was before only North and Rooker. Id. at ¶¶ 5, 18 and 28. Further, Plaintiff alleges that North's background check was conducted without his knowledge.

The Court concludes that Plaintiff fails to demonstrate, under the totality of the circumstances, that Plaintiff was subjected to a "severe or pervasive" racially hostile work environment. Ostensibly, Plaintiff bases his claim on his not being invited to at most one meeting, the temporary removal of his doorplate, which was explained to Plaintiff as a misunderstanding, and North's treatment of Plaintiff throughout his employment. Even accepting as true Plaintiff's allegations, as this Court must for purposes of summary judgment, Plaintiff has not presented sufficient evidence from which a reasonably jury could conclude that he was the subject to harassment, and that such harassment was based upon his race. Accordingly, the Court concludes that summary judgment should be granted as to Plaintiff's hostile work environment claim.

27

### b. Wrongful Termination/Disparate Treatment

To support a claim of disparate treatment discrimination, the plaintiff must show that the protected trait, race, actually played a role or influenced the employer's decision toward the plaintiff. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.133 (2000).

The plaintiff may prove discrimination by directly by showing that the defendant had a discriminatory motive in carrying out its employment decision. "Such evidence would take the form, for example, of an employer telling an employee, "I fired you because you are [African-American]." Smith v. Chrysler Corp., 155 F.2d 799, 805 (6th Cir. 1998). In addition, because there will rarely be a situation when direct evidence of discrimination is readily available and "there will seldom be an 'eyewitness' . . . to the employer's mental processes", plaintiffs claiming [disparate treatment] discrimination may, alternatively, establish their cases through inferential and circumstantial proof as established in McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)]. Kline v. Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997) (quoting U.S. Postal Serv. Bd. of Govs. v. Aikens, 460 U.S. 711, 716 (1983)) see also Price Waterhouse v. Hopkins, 490 U.S. 228, 271 (1989) (O'Connor, J., concurring) ("[T]he entire purpose of the McDonnell Douglas prima facie case is to compensate for the fact that direct evidence of intentional discrimination is hard to come by.").

Under the indirect evidence method, a plaintiff must first establish a prima facie case of discrimination by showing: (1) that the plaintiff belongs to a class protected under Title VII; (2) that he was qualified for the position he held prior to discharge; (3) that he suffered some type of adverse employment action and (4) that he was replaced by an individual not within the protected class. Id. at 802. When the plaintiff lacks the fourth element of the McDonnell Douglas prima facie criteria, a plaintiff can also make out a prima facie case by showing, in addition to the first three elements,

28

that for the same or similar conduct he was treated differently than similarly situated non-protected employees. Mitchell v. Toledo Hosp., 964, F.2d. 577, 582 (6th Cir. 1992).

Once these elements are proven, "[t]he burden then . . . shift[s] to the defendant to articulate some legitimate, non-discriminatory reasons for the plaintiff's rejection." McDonnell Douglas, 411 U.S. at 802. "The defendant must clearly set forth, through introduction of admissible evidence," reasons for it's actions. Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 255 (1981). The defendant "need not persuade the [trier of fact] that it was actually motivated by the proffered reasons," 450 U.S. at 254, but "only produce admissible evidence which would allow the trier of fact to rationally conclude that the employment decision was not motivated by discriminatory animus." Id. at 257. The defendant's burden is, thus, one of production; not persuasion. See id. at 254-55. Although the burden of production shifts to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against [him] remains at all time with the plaintiff." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

The plaintiff must then be given "the full and fair opportunity to demonstrate that the employer's proffered reason [was pretextual for discrimination]." Burdine, 450 U.S. at 256. This burden now merges with the ultimate burden of persuading the Court that the plaintiff has been a victim of intentional discrimination. Id. "Especially relevant to such a showing would be evidence that [non-protected] employees involved in acts . . . of comparable seriousness . . . were nevertheless retained. . . ." McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 282 (1976). An employer's termination of an employee for conduct that would otherwise warrant termination can be actionable, if the employer's sanctions are applied in a discriminatory manner. Id. at 283.

"[This] three-part inquiry provides 'an allocation of the burden of production and an order

29

for the presentation of proof in Title VII discrimat[ion] cases.'" <u>Cline v. Catholic Diocese of Toledo</u>, 206 F.3d 651, 659 (6th Cir. 2000) (citing <u>Hicks</u>, 509 U.S. at 506). These stages help facilitate courts in reaching the ultimate question of discrimination. <u>Id</u>. at 660.

Plaintiff does not present direct evidence of discrimination by the defendant, thus he must establish his claims indirectly by applying the <u>McDonnell Douglas</u> <u>prima</u> <u>facie</u> paradigm. "The <u>prima</u> <u>facie</u> phase '. . . serves to raise a rebuttable presumption of discrimination by 'eliminating the most common nondiscriminatory reasons for the employer's treatment of the plaintiff.'" <u>Cline</u>, 206 F.3d at 660 (quoting <u>Burdine</u>, 450 U.S. at 253-54).

Plaintiff is an African-American male, and is therefore a member of class protected under Title VII. (Docket Entry No. 1, Verified Complaint at ¶ 7). Plaintiff suffered an adverse employment action when he was terminated in September 2002. (Docket Entry No. 17, Plaintiff's Response to Metro's Statement of Undisputed Facts at ¶ 34). Issues remain, however, as to whether Plaintiff was qualified for his position and whether he was replaced by a non-protected individual or that he was treated differently than similarly situated non-protected employees.

Metro contends that Plaintiff was not qualified for his position, citing Plaintiff's failure to produce a satisfactory training program after his initial six-month probationary period and his forty-five-day probationary extension. (Docket Entry No. 14, Metro's Memorandum in Support of Summary Judgment at 18-20). It is undisputed that North told Plaintiff his June 6, 2002 proposal "unacceptable", that Rooker was not pleased with the presentation, and that the two supervisors spent between twenty and thirty minutes communicating their disappointment to Plaintiff. (Docket Entry No. 17 at ¶¶ 19-21). Further, Plaintiff does not dispute that after this June 6 meeting, Plaintiff failed to prepare training program drafts that "constitute[d] a complete and finished plan, without

30

errors." Id. at ¶ 33.

In response, Plaintiff cites as evidence of his qualification for his position with the Tax Assessor's Office his prior experience and North's positive appraisal of Plaintiff in the June 2002 office newsletter. (Docket Entry No. 16, Plaintiff's Response in Opposition to Summary Judgment at 27-28).

In support of its contention that Plaintiff was unqualified for his position with the Tax Assessor's Office despite his purported prior experience, Metro relies on the proposition in the Sixth Circuit that "[i]n order to show that he was qualified, [a plaintiff] must prove that he was performing his job at a level which met his employer's legitimate expectations. Moreover, if [a plaintiff] was not doing what his employer wanted him to do, he was not doing his job [and cannot] merely . . . challeng[e] the judgment of his supervisors." McDonald v. Union Camp Corp., 898 F.2d 1155, 1160 (6th Cir. 1990) (internal quotations omitted).

Although Plaintiff does not dispute that Rooker and North expressed dissatisfaction with his work product, the Court concludes that here the quality of Plaintiff's work is a material issue in dispute. Metro's characterization of Plaintiff's work product is in direct contrast to the announcement in the office newsletter, prepared by North, that Plaintiff is "making a real contribution" to the Office. (Docket Entry No. 1, Verified Complaint at ¶ 14 (quoting North News June 2002 at 1-2)). The dispute is compounded by the publication of this newsletter at around the same time as Plaintiff's "unacceptable" June 6 presentation to North and Rooker. Compare id., with Docket Entry No. 17, Plaintiff's Response to Metro's Statement of Undisputed Facts at ¶ 19. Metro argues that North prepared a positive review of Plaintiff's performance and value to the Tax Assessor's Office as a means of motivation. (Docket Entry No. 10, Metro's Motion for Summary

31

Judgment, attachment thereto, North Deposition at 50).

Based upon the record in this case, the Court believes that Metro's explanation is reasonable. The reasonableness of Metro's explanation, however, is best determined by the fact finders. Accordingly, the Court concludes that for purposes of evaluating Metro's motion for summary judgment, and more specifically for the establishment of a prima facie claim of race discrimination, Plaintiff has established his qualification for his position with the Tax Assessor's Office.

Plaintiff contends that he "was either replaced by a white male, Dean Lewis . . . or his duties were assigned to the other white managers." (Docket Entry No. 16 at 29). In response, Metro contends that Plaintiff cannot establish that he was replaced by a non-protected employee because Plaintiff's duties were redistributed among the remaining managers after Plaintiff's termination. (Docket Entry No. 21, Metro's Reply in Support of Summary Judgment at 7). According to Rooker, Dean Lewis was hired as the manager of the real property appraisal division, and he neither replaced Plaintiff nor assumed any of his duties. (Docket Entry No. 18, Plaintiff's Appendix, Exhibit 15 attached thereto, Rooker Deposition at 122).

In support of his contention that he was replaced by Lewis, Plaintiff relies upon the deposition testimony of Metro employees Bertha Harris and Theodore Harris. See Docket Entry No. 16 at 29. Bertha Harris testified that she believes that Lewis replaced Plaintiff, but that Lewis was never identified as a training director to her and that she does not know anything about Lewis but she "just know[s] he works in the Tax Assessor's Office." Id., Exhibit 26 attached thereto, Bertha Harris Deposition at 19. Moreover, when asked who replaced Plaintiff, Theodore Harris replied, "I guess Dean Lewis," and admitted that "I don't know exactly, [be]cause I don't know who is hired for what." Id., Exhibit 34 attached thereto, Theodore Harris Deposition at 15. However, Theodore

32

Harris admitted that when Plaintiff was hired as training director, there was an announcement in the office newsletter. Id. The Court concludes that this proof does not rebut Metro's evidence that Plaintiff was not replaced by Lewis and is insufficient to create a factual dispute on this issue.

Further, the mere redistribution of a terminated employee's duties among the remaining employees does not satisfy the "replacement" requirement of a prima facie Title VII claim. "A person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." Barnes v. GenCorp, Inc., 896 F.2d 1457, 1465 (6th Cir. 1990) (reduction in workforce). Thus, Plaintiff cannot prove that he was replaced by a non-protected employee.

In the alternative, Plaintiff contends that he was subjected to disparate treatment during his tenure at the Tax Assessor's Office. In support of this contention, Plaintiff claims that although Diaz-Barriga, a management-level employee, was "equally directed to complete [a] training plan," Diaz-Barriga was not fired for the failure to produce an adequate plan. (Docket Entry No. 16 at 28). Plaintiff also claims that he was the only management-level employee terminated during a probationary period, and such termination demonstrates disparate treatment because Plaintiff was the only African-American management-level employee. Id. at 28. Further, Plaintiff claims that his counsel's August 20, 2002 letter to North demonstrates disparate treatment. Id. (citing Docket Entry No. 1, Exhibit E attached thereto, Danner Letter Aug. 20, 2002).

Metro argues that Plaintiff's reliance on Metro's treatment of Diaz-Barriga is misplaced because he is not "similarly situated" to Plaintiff as an established, non-probationary employee, nor has Plaintiff established that Diaz-Barriga is belongs to a non-protected group. (Docket Entry No. 21 at 6-7).

To be similarly situated, the discrimination plaintiff must show that "all of the relevant aspects of his employment situation are 'nearly identical' to those of the [white] employees who he alleges were treated more favorable." Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994). Furthermore, the non-protected employees "must have engaged in the same [or similar] conduct without such . . . mitigating factors that would distinguish their actions" from Plaintiff's. Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (1992).

The Court agrees with Metro that the critical distinction between Plaintiff and the other management-level employees is that Plaintiff was at all times throughout his eight and one-half month tenure at the Tax Assessor's Office a probationary employee. The Sixth Circuit has held that probationary and non-probationary employees are not "similarly situated" for purposes of Title VII. See, e.g., Wofford v. Middletown Tube Works, Inc., 67 Fed. Appx. 312, 316, 2003 WL 21321186, at *3 (6th Cir. June 5, 2003); White v. Ohio, 2 Fed. Appx. 453, 456-57, 2001 WL 69196, at *3 (6th Cir. Jan. 18, 2001); see also Cooper v. City of North Olmstead, 795 F.2d 1265, 1271 (6th Cir. 1986) (ordering district court on remand to "make findings as to whether [the plaintiff] has established that she was treated differently than other [of the defendant's] probationary employees.").

In White, an African-American former probationary employee brought a Title VII disparate treatment claim against her former employer, the Office of the Ohio Attorney General. White, 2 Fed. Appx. at 454. The plaintiff was terminated following the expiration of her probationary period for receiving an "extraordinary number" of personal telephone calls while at work, for which she received warnings and unfavorable performance evaluations. Id. at 455. In support of her disparate treatment claim, the plaintiff alleged that two non-probationary, permanent white employees received and made a comparable amount of telephone calls to the plaintiff but were not reprimanded.

34

Id. at 456.

The Sixth Circuit held the plaintiff failed to prove her prima facie disparate treatment claim because the plaintiff was not "similarly situated" to the non-probationary employees. Id. at 457. With particular reference to the Office of the Ohio Attorney General, the Sixth Circuit noted that "[p]robationary and permanent employees . . . face differentiating circumstances. Probationary employees face separate standards for removal, have no seniority status, receive reviews both in the middle and at the end of their probationary period, and are not covered by disciplinary procedures available to permanent employees." Id. The Sixth Circuit noted further that "[c]ase law . . . challenges a finding that probationary and permanent employees are similarly-situated. Id. (citing Herr v. Airborne Freight Corp., 130 F.3d 359, 362 (8th Cir. 1997); McKenna v. Weinberger, 729 F.2d 783, 789 (D.C. Cir. 1984); Williams v. Cuomo, 961 F. Supp. 1241, 1245 (N.D. Ill. 1997), aff'd, 151 F.3d 1035 (7th Cir. 1998), cert. denied, 525 U.S. 1160 (1999)). In Williams v. Cuomo, for example, the court held that "there really were no similarly situated employees" to the plaintiff, an African-American male who was the only probationary employee. 961 F. Supp. 1241, 1245.

Here, Plaintiff concedes that he was the only probationary management-level employee. Diaz-Barriga, and the other managers to whom Plaintiff compares himself, are non-probationary, permanent employees. Although Plaintiff contends that he is the only management-level employee terminated during the probationary period, Plaintiff presents no proof of that contention, nor does he demonstrate that the other management-level employees received criticism or poor performance evaluations similar to Plaintiff during their probationary period.

The record reveals that Plaintiff received a poor performance evaluation at the end of his initial probationary period. (Docket Entry No. 17, Plaintiff's Response to Metro's Statement of

Undisputed Facts at ¶ 22). It is also undisputed that rather than terminate Plaintiff, North extended Plaintiff's probationary period an additional forty-five days. Id. at ¶ 26; Docket Entry No. 10, attachment thereto, Plaintiff Deposition, late-filed Exhibit 2 attached thereto, EEOC Complaint, attachment thereto, Plaintiff's performance review. Upon the expiration of those forty-five days, Plaintiff was terminated due to his failure to complete a training program satisfactory to North and Rooker. (Docket Entry No. 17 at ¶¶ 33-34; Docket Entry No. 18, Exhibit 15 attached thereto, Rooker Deposition, Exhibit 19 attached thereto, Termination Letter). Plaintiff presents no evidence that he was subject to disparate treatment to any other probationary management-level employee.

In sum, Plaintiff has neither demonstrated that he was replaced by a non-protected employee nor presented sufficient proof from which a reasonable jury could find that Plaintiff was subject to disparate treatment from similarly-situated non-protected employees. In a word, Plaintiff has failed to "produce admissible evidence which would allow the trier of fact to rationally conclude that the employment decision was not motivated by discriminatory animus." Tex. Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 257 (1981). Accordingly, Plaintiff has failed to state a prima facie claim of wrongful termination based on race or disparate treatment based on race, and summary judgment in favor of Metro should be granted.

### c. Retaliation

Title VII provides in pertinent part: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

36

As with other Title VII claims, in the absence of direct evidence or retaliation, "retaliation claims are governed by the <u>McDonnell Douglas</u> burden-shifting framework." <u>Weigel v. Baptist Hosp.</u>, 302 F.3d 367, 381 (6th Cir. 2002) (citing <u>McDonnell Douglas v. Green</u>, 411 U.S. 792, 802 (1973)). A plaintiff establishing a <u>prima</u> <u>facie</u> case of retaliation must show that: "(1) he engaged in a protected activity, (2) he was subjected to an adverse employment action, and (3) a causal link exists between a protected activity and the adverse action." <u>Majewski v. Auto. Data Processing, Inc.</u>, 274 F.3d 1106, 1117 (6th Cir. 2001). "The burden of establishing a <u>prima</u> <u>facie</u> case in a retaliation action is not onerous, but one easily met." <u>Nguyen v. City of Cleveland</u>, 229 F.3d 559, 563 (6th Cir. 2000). If the plaintiff establishes his <u>prima</u> <u>facie</u> claim, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for its action," which could in turn be rebutted by the plaintiff with a showing of pretext. <u>Majewski</u>, 274 F.3d at 1117. Rebuttal evidence of pretext, as the Sixth Circuit explained, is a "direct attack on the credibility of the employers proffered reason and if shown raises 'a suspicion of mendacity.'" <u>Manzer v. Diamond Shamrock Chem. Co.</u>, 29 F.3d 1078, 1083 (6th Cir. 1994) (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511 (1993)).

Here, Plaintiff engaged in protected activity when he filed his complaint with the Metro Department of Human Resources. <u>See</u> Docket Entry No. 1, Verified Complaint, Exhibit C attached thereto, North Memorandum Aug. 6, 2002. Plaintiff was subjected to an adverse employment action upon his termination on September 3, 2002. (Docket Entry No. 17 at ¶ 34). Plaintiff's termination occurred within weeks of Plaintiff's complaint, during the pendency of the Department of Human Resources's investigation, and during the course of Plaintiff's counsel's ongoing correspondence with North and North's counsel regarding Plaintiff's allegations of discrimination. <u>See</u>, Docket

37

Entry No. 1 at Exhibits A-I attached thereto. The timing of and circumstances surrounding Plaintiff's termination raises an inference that a causal link may exist between Plaintiff's complaint and his termination. Accordingly, the Court is satisfied that Plaintiff has presented sufficient proof of a prima facie claim of retaliation.

Metro has demonstrated that Tax Assessor North and Deputy Assessor Rooker were dissatisfied with Plaintiff's work product, and it is undisputed that North and Rooker expressed to Plaintiff their dissatisfaction and disappointment with Plaintiff's performance. (Docket Entry No. 17 at ¶¶ 19-21). It is further undisputed that Plaintiff received a poor performance evaluation, and that he failed to produce a training program that North and Rooker deemed satisfactory upon the completion of his second probationary period. Id. at ¶¶ 22, 25 and 33-34; see also Docket Entry No. 18, Exhibit 15 attached thereto, Rooker Deposition, Exhibit 19 attached thereto, Termination Letter. Thus, Metro has articulated legitimate, nondiscriminatory reasons for its decision to terminate Plaintiff.

As to pretext, at all relevant times, JoAnn North served as the Tax Assessor and was the target of the substance of much of Plaintiff's allegations. See Docket Entry No. 1, Exhibit E attached thereto, Danner Letter Aug. 20, 2002. On August 6, 2002, North wrote to Plaintiff that "as a result of the grievance filed with Metro Human Resources, any discussion relevant to the pending complaint will be inappropriate[,]" and that all questions regarding Plaintiff's grievance should be directed to Veronica Frazier of the Metro Department of Human Resources. Id., Exhibit C attached thereto, North Memorandum Aug. 6, 2002. Yet, North asked Plaintiff to submit in writing detailed statements of alleged racial discrimination to North herself. Id., Exhibit D attached thereto, North Letter Aug. 19, 2002, and Exhibit G attached thereto, North Letter Aug. 23, 2002.

Case 3:03-cv-00990   Document 25   Filed 07/12/05   Page 38 of 40 PageID #: 78

North also corresponded with Plaintiff's counsel regarding Plaintiff's allegations, either directly or through her own counsel. Id., Exhibit F attached thereto, North Letter Aug. 22, 2002, and Exhibit I attached thereto, S. North Letter Sept. 3, 2002.  North's counsel advised Frazier, during the pendency of Frazier's investigation, that there existed a "paucity of facts" and that "[t]he work of the Assessor's Office has been disrupted and production hurt by this matter."  Id., Exhibit K attached thereto, S. North Letter Sept. 19, 2002.  Further, upon receiving a letter from Frazier stating that the Human Services's investigation into Plaintiff's claims have has revealed evidence "requir[ing] further inquiry[,]" Id., Exhibit L attached thereto, Frazier Letter Oct. 11, 2002, North nevertheless requested that Frazier "close [the] investigation [of Plaintiff's allegations] with a finding of fact that his allegations have no merit."  Id., Exhibit M attached thereto, S. North Letter Oct. 22, 2002.

Metro contends that North undertook her own investigation only after receiving no word from Frazier for two weeks, and that her conclusion that Plaintiff's allegations were baseless was a result of her independent investigation.  (Docket Entry No. 18, Plaintiff's Appendix, Exhibit 27 attached thereto, North Deposition at 57-58).  Metro's contention is plausible.  However, North conducted independent investigation notwithstanding the fact that North herself was the subject of many of Plaintiff's allegations and that she initially deferred to the investigative process of the Department of Human Services, as well as the fact that North requested Frazier close her investigation despite Frazier's finding that further inquiry was necessary.  When viewed in the light most favorable to Plaintiff, this sequence of events, combined with Plaintiff's termination, all raise an inference from which a reasonable jury could conclude that Metro's reasons proffered for Plaintiff's termination were merely pretextual for Plaintiff's filing of his complaint with Metro's

39

Department of Human Services.

Accordingly, the Court concludes that summary judgment is inappropriate on Plaintiff's retaliation claim.

### d. Punitive Damages

An plaintiff may not recover punitive damages from "a government, governmental agency, or political subdivision" defendant in an action brought under Title VII. 42 U.S.C. § 1981a(b)(1); Robinson v. Runyan, 149 F.3d 507, 517 (6th Cir. 1998) ("Congress amended Title VII in 1991 to permit punitive damages in Title VII actions. The amendment, however, specifically exempted government, government agencies, and political subdivisions."). Thus, Plaintiff may not recover punitive damages in this action against the government defendant, the Metropolitan Government of Nashville and Davidson County.

### C. CONCLUSION

For the foregoing reasons, Defendant Metropolitan Government of Nashville and Davidson County's (Docket Entry No.10) should be granted in part. Plaintiff's claims of a racially hostile work environment, wrongful termination and disparate treatment based on race, as well as Plaintiff's claim of punitive damages should be dismissed.

An appropriate Order is filed herewith.

**ENTERED** this the ___ day of July, 2005.

WILLIAM J. HAYNES, JR.
United States District Judge

40